# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

O'Brien &Wolf, LLP,                                **Civil No. 11-CV-1253 (SER)**

       Plaintiff,

v.                                                 **MEMORANDUM AND ORDER**

Associated Banc-Corp,
Associated Bank,

       Defendants.

---

   Daniel J. Heuel, Esq., O'Brien & Wolf, PO Box 968, Rochester, MN 55903-0068 for Plaintiff.

   Matthew J. Cornetta, Esq., Ruder Ware, LLSC, PO Box 187, Eau Claire, WI 54702 for Defendants.

---

STEVEN E. RAU, United States Magistrate Judge

   This action arises out of a recent scam perpetrated on law firms and attorneys across the nation. The scam involves the deposit of counterfeit checks, and results in attorneys losing large sums of money, often from client trust accounts. Plaintiff O'Brien & Wolf, LLP, ("O&W") fell victim in 2011, and now seeks to recover from its bank, Defendants Associated Banc-Corp and Associated Bank (collectively, "Associated"). Associated moved for summary judgment on October 1, 2012, but in its Reply Memorandum and at the hearing on this matter, Associated conceded that some of O&W's claims could survive summary judgment. Accordingly, the Court considers Associated's Motion to be a motion for partial summary judgment. (Mot. for Summ. J.) [Doc. No. 16]; (Reply Mem. in Supp. of Defs.' Mot. for Summ. J., "Reply Mem.") [Doc. No. 26].

The Parties consented to jurisdiction by the undersigned pursuant to 29 U.S.C. § 636(c) on January 17, 2012.  (Notice, Consent, and Order of Reference, Exercise of Jurisdiction by a U.S. Magistrate Judge) [Doc. No. 11].

Based on all the files, records, and proceedings herein, Associated's Motion for Summary Judgment [Doc. No. 16] is granted in part and denied in part.

## I. BACKGROUND

### A.  The Jane Sato Scam

In February 2011, O&W received an email from Jane Sato ("Sato") seeking assistance collecting a debt.  (Jane Sato Email dated Feb. 15 2012 "Sato Email", attached to Dep. of Lana McGill taken July 24, 2012 "McGill Dep.", attached to Aff. of Matthew J. Cornetta "Cornetta Aff.") [Doc. No. 20-1 at 15].  Sato wrote that she lived in Japan and needed a Minnesota attorney to help her.  (*Id.*).

O&W attorneys do some collection work, although it is not the main focus of their practice.  (McGill Dep. at 9 ¶ 1-9).  Still, O&W believed that Sato was a legitimate prospective client, and commenced an attorney-client relationship with her.  (McGill Dep. at 13 ¶¶ 11-20).  O&W attorney Robert Spelhaug ("Spelhaug") took the case.  He required a $5,000.00 retainer, and Sato duly sent a check for $5,000.00 ("the Retainer").  (Robert Spelhaug Email dated Feb. 15, 2012, "Spelhaug Email", attached to McGill Dep., attached to Cornetta Aff.) [Doc. No. 20-1 at 14]; (McGill Dep. at 17 ¶¶ 5-6).

Sato's stated aim was to collect a debt from a Minnesota resident, Anthony Smith.  (Sato Email).  According to Sato, Smith borrowed $350,000.00 from her, but only repaid a portion of the loan.  (*Id.*).  Sato supplied a purported Loan Agreement Promissory Note as evidence of the debt.  (Loan Agreement Promissory Note, attached to McGill Dep., attached to Cornetta Aff.)

[Doc. No. 20-2 at 4].   Three days after Sato engaged O&W, Anthony Smith sent a check for $110,500.00 from TD Bank, N.A. ("TD Bank"), payable to the firm.  (Check dated Feb. 18, 2011 "the Check" attached to McGill Dep. attached to Cornetta Aff.) [Doc. No. 20-1 at 13].   The firm deposited the Check in their trust account ("the Account") on February 23, 2011.  (McGill Dep. at 16 ¶¶ 21-25).

Sato then inquired about disbursement of the funds.   (McGill Dep. at 21 ¶¶ 13-21). O&W employee Lana McGill ("McGill")[1] called Associated on March 3, 2011 and asked whether funds from the Retainer and the Check were available.   (McGill Dep. at 23 ¶¶ 7-13). McGill testified at her deposition that an unknown Associated employee informed her that the "checks had cleared."   (McGill Dep. at 27 ¶¶ 2-15).   McGill did not ask the Associated employee's name during this conversation.  (*Id.*).

McGill called Associated again on March 8, 2011 and spoke to Associated employee Maria Brouillard ("Brouillard").   (*Id.* at 32-34).   McGill planned to complete a wire transfer to Sato that day, so the purpose of her call was to confirm that funds from the Retainer and the Check were available.  (*Id.*).   Brouillard told McGill that the funds were in O&W's account.  (*Id.* at 36 ¶ 9-10).   Following her conversation with Brouillard, McGill wired $110,500.00 to Sato at Resona Bank of Japan.  (Compl.) [Doc. No. 1-1 ¶ 10].

Six days later, McGill received another email from Jane Sato.  (*Id.* ¶ 12).   McGill was alarmed, because the new email was identical to Sato's first message to O&W.  (*Id.*).   McGill suspected a fraud, and contacted TD Bank immediately.  (*Id.* ¶ 13).   TD Bank confirmed that the Retainer and the Check were counterfeit.  (*Id.*).   McGill and Spelhaug notified Associated that a

---

[1]     McGill is an administrative assistant, not an attorney.

fraud may have occurred; Associated employee Craig Pelissero ("Pelissero") informed them he would take immediate corrective action. (*Id.* at ¶ 14).

The next day, Associated employee Laura Peters ("Peters") told O&W that Smith's $110,500.00 check was returned as counterfeit, and Associated "was going to debit [O&W's] trust account for that amount." (*Id.* at ¶ 15). O&W immediately deposited $110,500.00 into its trust account, to cover any payments it may have to make to or on behalf of its clients.[2]

O&W learned in the course of discovery that Associated has special internal procedures for depositing checks such as Anthony Smith's. (Dep. of Susan Smith "Smith Dep.", taken on July 24, 2012, Ex. A, attached to Aff. of Counsel in Opp'n to Defs.' Mot. for Summ. J. "Heuel Aff.") [Doc. No. 24-1 at 21-27]. Namely, Associated employees were trained to spot checks like Anthony Smith's because it had an eight-digit routing number, one digit fewer than the typical number of digits for American checks. (*Id.* at 20 ¶¶ 9-24). Associated also had special handling and transport procedures for checks that appeared to be drawn on a foreign bank. (Depositing an International Check Policy, Ex .1 attached to Smith Dep.) [Doc. No. 24-1 at 32-45].

In addition to the procedures outlined above, Associated provides training to its new employees on "fraud recognition and prevention" to "[introduce] the employee to the scope of the problem, [explain] the methods used to obtain personal identification from our consumers; phishing;[3] vishing;[4] and how this is used to facilitate fraud." (Financial Crimes Department – Fraud Training, Ex. C attached to Heuel Aff.) [Doc. No. 24-2 at 1].

---

[2]     O&W notified local law enforcement and the Federal Bureau of Investigation, and the Office of the Director of the Minnesota Board of Professional Liability of the loss, and sought guidance from the Minnesota Board of Professional Liability on its duties under the Minnesota Rules of Professional Conduct. (Order dated Aug. 3, 2012, "Aug. 2012 Order") [11-cv-3748 Doc. No. 32 at 2 n.2].

[3]     According to the Internet Crime Complaint Center, a partnership between the Federal Bureau of Investigation and the National While Collar Crime Center, "phishing" is "the act of

**B.  Procedural History**

O&W filed suit in Minnesota state court against Associated on April 15, 2011. Associated removed the case to the District of Minnesota on May 13, 2011.  (Notice of Removal) [Doc. No. 1]; (Am. Notice of Removal) [Doc. No. 4].  The Parties consented to jurisdiction by the undersigned on January 17, 2012.  (Notice, Consent, and Order of Reference, Exercise of Jurisdiction by a U.S. Magistrate Judge) [Doc. No. 11].  In October 2012, Associated moved for summary judgment, requesting that the court dismiss O&W's claims "in their entirety."  (Mot. for Summ. J.) [Doc. No. 16]; (Mem. in Supp of Defs.' Mot. for Summ. J.) [Doc. No. 18 at 15].

O&W then filed its Memorandum in Opposition, detailing what it had learned in the course of discovery about Associated's policies for handling international checks.  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. "Mem. in Opp'n") [Doc. No. 23].  Associated filed a Reply Memorandum, this time acknowledging that some of O&W's claims "should not be dismissed on summary judgment."  (Reply Mem. at 2).  Associated argued that O&W's Memorandum in Opposition "essentially clarifies some of its claims in this action, while adding additional claims to those originally pled in the Complaint."  (*Id.* at 1).  Associated urged the Court to consider O&W's Memorandum in Opposition as an untimely motion to amend the Complaint, because the Memorandum in Opposition alters the pleadings in substantive ways.  (*Id.* at 2 n.1).

---

sending an email falsely claiming to be an established legitimate business in an attempt to dupe the unsuspecting recipient into divulging personal, sensitive information such as passwords, credit card numbers, or bank account information and after directing the user to visit a speficied website."  Internet Crime Complaint Center, "Internet Crime Schemes", (undated) http://www.ic3.gov/crimeschemes.aspx#item-14.

[4]    The Federal Bureau of Investigation describes "vishing" as an "automated phone call" that informs a person of a phony problem with a bank account.  The victim is then "given a phone number to call or a website to log into and asked to provide personal identifiable information—like a bank account number, PIN, or credit card number—to fix the problem."  Federal Bureau of Investigation, "Smishing and Vishing," (Nov. 24, 2010), http://www.fbi.gov/news/stories/2010/november/cyber_112410.

At oral argument on November 28, 2012, O&W indicated that it would voluntarily dismiss Count Six of its Complaint.  O&W maintains that its other claims would withstand Associated's Motion for Summary Judgment.

### C.    The Liberty Insurance Underwriters Litigation

In December 2011, O&W also filed suit against its malpractice insurer, Liberty Insurance Underwriters, Inc. ("Liberty").  (Compl.) [11-cv-3748 Doc. No. 1-1].  In that suit, O&W alleged that its "erroneous transfer of its clients' trust funds to Jane Sato was an act or omission in the conduct of its professional and fiduciary duties to its clients, giving rise to a claim of negligence against [O&W]." (*Id.* ¶ X).  O&W accused Liberty of "[failing] and [refusing] to provide coverage and pay the claim according to the plain language of the [malpractice] policy" and asserted a right to $110,500.00 as well as interest, costs, disbursements, and attorney's fees.  (*Id.* at ¶ XII).

Liberty removed the action to federal court a few weeks later.  (Notice of Removal) [Doc. No. 1]; (Am. Notice of Removal) [Doc. No. 4].  In March 2012, O&W moved for summary judgment in the matter, identifying an Eleventh Circuit case, *Nardella Chong, P.A. v. Medmarc Cas. Ins. Co.*, 642. F.3d 941 (11th Cir. 2011) in support of their motion.  (Mot. For Summ. J. Pursuant to Fed. R. Civ. P. 56(a)) [11-cv-3748 Doc. No. 11]; (Pl.'s Mem. of Law in Supp. of its Mot. for Summ. J.) [11-cv-3748 Doc. No. 12 at 1, 5].  *Nardella Chong* involved similar facts, and the Eleventh Circuit decided that a firm's "erroneous transfer of its clients' trust funds to a third party was an act or omission in the conduct of its professional fiduciary duties that would give rise to a claim of negligence against it . . . covered by the plain terms of [its malpractice insurance] policy." *Nardella Chong*, 642 F.3d at 943.

Judge Joan N. Ericksen adopted the Eleventh Circuit's reasoning in *Nardella Chong*. She found that Liberty breached its malpractice insurance contract with O&W when it refused to pay the amount lost in the Jane Sato incident. "[I]t is undeniable that O&W is liable for malpractice and the amount of the loss was $110,500.00." (Order dated Aug. 3, 2012, "Aug. 2012 Order") [11-cv-3748 Doc. No. 32 at 10]. She further wrote: "The Court finds that managing a client trust account creates a fiduciary relationship between the lawyer and client that clearly falls within an attorney's 'professional legal services.'" (*Id.* at 12-13). Judge Ericksen granted O&W's motion for summary judgment, and awarded O&W $95,500.00, plus an additional $26.16 per day in prejudgment interest beginning June 17, 2011 until the date of judgment. (*Id.* at 18). Liberty appealed Judge Ericksen's August 2012 Order to the Eighth Circuit. (Notice of Appeal of Liberty Insurance Underwriters, Inc.) [11-cv-3748 Doc. No. 35]. O&W filed a Satisfaction of Judgment on January 11, 2013. [11-cv-3748 Doc. No. 42].

Liberty filed a motion to dismiss its appeal, which the Eighth Circuit granted on February 5, 2013. (United States Ct. of Appeals J.) [11-cv-3748 Doc No. 43]; (United States Ct. of Appeals Mandate) [11-cv-3748 Doc. No. 44]. The Eighth Circuit's Judgment and Mandate made the decision in *O'Brien and Wolf, LLP, v. Liberty Insurance Underwriters, Inc.* final.

### D.  Effect of the Liberty Insurance Underwriters Litigation on the Instant Matter

As it became clear that Liberty would likely abandon its appeal to the Eighth Circuit, this Court ordered the Parties to provide supplemental briefing in letter format on the effect of the litigation between Liberty and O&W in February 2013. (Letters dated Jan. 30, 2013) [Doc. Nos. 28, 29]. The Parties submitted their views on (1) the damages that remain at issue, (2) whether the Court continues to have subject-matter jurisdiction, and (3) whether collateral estoppel applies in this case.

7

O&W asserted that its judgment against Liberty had "the practical effect of reducing [O&W's] out-of-pocket damages to $15,000.00, the amount of its deductible under its policy of insurance with Liberty." (Letter dated Jan. 30, 2013, "O&W Letter") [Doc. No. 28 at 1].   O&W asserted, however, that Associated's liability was not "settled or paid" because the action against Liberty was designed to enforce an insurance contract, not to indemnify Associated.   (*Id.*). O&W further claimed that "Liberty is entitled, both by contract and by common law, to seek and obtain reimbursement from 'any person' liable to [O&W]," and quoted the subrogation language in its malpractice insurance policy in support of this contention.   (*Id.* at 1-2).   O&W stated that Liberty "steps into the shoes" of O&W, and that Liberty had informed O&W that "it intends to pursue its claim for reimbursement against Associated in this lawsuit and has expressly cautioned O&W to cooperate, assist, and do nothing to prejudice Liberty's subrogation rights." (*Id.* at 2).   O&W suggested the joinder of Liberty to the instant action pursuant to either Rule 19 or 20 of the Federal Rules of Civil Procedure.   (*Id.* at 3).

O&W further acknowledged that, should Liberty waive its right to reimbursement, "the matter in controversy between [O&W] and Associated is indisputably less than $75,000.00" and remand to the state courts would be likely.   (*Id.*).   Finally, O&W argued that Judge Ericksen's decision in O&W's suit against Liberty did not permit the application of collateral estoppel to its claims against Associated.   (*Id.* at 4).   O&W noted that Judge Ericksen had not found O&W negligent (although she did hold that O&W committed malpractice) and that professional malpractice is different from ordinary negligence.   (*Id.*).   Neither did Judge Ericksen rule that O&W's "acts were a direct cause of their own loss." (*Id.*).

Associated, in its letter brief, agreed with many of O&W's arguments.   Associated stated that the amount in controversy was now less than the jurisdictional minimum of $75,000.00, but

argued that the Court should not dismiss and remand the action, "because that does not remove the issue of Liberty Mutual's subrogation claim."   (Letter dated Jan. 30, 2013, "Associated Letter") [Doc. No. 29 at 1-2].   Associated did argue, however, that Judge Ericksen's decision constituted a finding of negligence, since "malpractice" and "wrongful acts" "are simply different terms for negligence."   (*Id.* at 3).   Associated argued that "[t]he use of a different term that basically means "professional negligence" does not mean that the issue of [O&W's] negligence was *not* adjudicated in the prior action." (*Id.* at 3-4) (emphasis in original).

After considering the Parties' letter briefs, the Court ordered O&W to restyle its Complaint to plead Liberty's subrogation interest in this case pursuant to Federal Rule of Civil Procedure 15(d).   (Order dated Feb. 4, 2013) [Doc No. 31].   Associated was granted fourteen days from the date of filing of the restyled Complaint to file a response.   (*Id.*).   O&W filed its Supplemental Complaint on Feb. 14, 2013, asserting Liberty's subrogation interest. (Supplemental Compl.) [Doc. No. 32].   The Supplemental Complaint therefore remedied any potential questions about sufficiency of the amount in controversy following the resolution of the Liberty Insurance litigation.

## II.     DISCUSSION

### A.     Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   On a motion

for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Ludwig v. Anderson*, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Liberty Lobby, Inc.,* 477 U.S. at 248.  Where the unresolved issues are primarily legal rather than factual, as in this case, summary judgment is particularly appropriate.  *Schrier v. Halford*, 60 F.3d 1309, 1310 (8th Cir. 1995).

**B.   Nature of Claims against Associated and Voluntary Dismissal of Count Six**

O&W's Complaint contains thirteen counts.  The claims currently before the Court fall into a few broad categories—fraud-based claims, negligence-based claims, statutory violation, and breach of contract. (Compl. at 5-15).  The Complaint also contains a claim for Breach of Fiduciary Duty.  (*Id.* at 15).  The original complaint is substantively spartan.  For example, O&W's statutory violation claims do not identify any statutes upon which the claims are based, a fact Associated did not fail to notice. (Mem. in Supp. at 13-15).  O&W's Memorandum in Opposition added much-needed detail to the Complaint, specifying facts and referencing documents to explain its claims and assertions.  Accordingly, while this Order is based on the complaint, it relies heavily on the information supplied in O&W's memorandum in opposition.

At the hearing on this matter, O&W represented to the Court that it would voluntarily dismiss Count Six, a contract-based claim.  That claim is therefore dismissed.  This Order addresses all of the remaining counts in the Complaint.

## C.    Negligent Misrepresentation and Equitable Estoppel Claims (Counts One and Three)

O&W asserts two claims stemming from the telephone conversations McGill had with Associated employees: Count One is a negligent misrepresentation claim, Count Three, for equitable estoppel.  The statements giving rise to these claims are the representations to Lana McGill, on March 3, 2011 and March 8, 2011, that the Retainer and Check had "cleared" and the funds were available for disbursement.  (Compl. ¶ XVII).  There is an important qualitative difference between the two claims—in the March 8, 2011 conversation, O&W has pleaded with particularity all the details of the conversation, but for the March 3, 2011, conversation it cannot identify the employee to whom McGill spoke.[5]

A review of the timeline reveals that the March 8, 2011 conversation is the more significant of the two, since it was that conversation that caused McGill to wire the funds to Sato. (McGill Dep. at 34 ¶¶ 9-10).  McGill testified in her deposition:

> I remember for sure on the March 8 conversation that they did tell me it was okay to do the funds [transfer] because I was wire transferring them and I wanted to double-check that what they told me before on the third was true and that the funds were in there and it was okay, because I was actually sending out the funds on the eighth so I remember for sure that they told me is was okay to disburse the funds.

(*Id.* ¶¶ 2-11).

### 1.  Negligent Misrepresentation Claim

To succeed in a negligent misrepresentation claim, a plaintiff must demonstrate reliance on the information supplied by the defendant.  *See Hardin Cty. Sav. Bank v. Hous. &*

---

[5]     The Parties have engaged in extensive discovery to ascertain the identity of the Associated employee who allegedly spoke to McGill on March 3, 2011. (Mem. in Opp'n at 9 N.4).  At the hearing, Associated represented to the Court that the call actually went to a large call center, which received thousands of calls per day.  Associated was unable to find any recording or record of McGill's March 3, 2011 call.

*Redevelopment Auth. of City of Brainerd*, 821 N.W.2d 184, 194 (Minn. 2012*); Williams v. Bd. of Regents of Univ. of Minn.*, 763 N.W.2d 646, 652 (Minn. 2009) (in negligent misrepresentation claim, trial court would focus on the representation, plaintiff's reliance, and whether plaintiff incurred losses as a result of reliance). McGill's deposition testimony makes clear that while she inquired about the availability of the funds on March 3, 2011, she *acted on* representations Brouillard made on March 8, 2011, because she planned to make the wire transfer that day. In other words, if Brouillard had (hypothetically) told McGill that the March 3, 2011 representations were inaccurate and the funds were not available, McGill would not have wired the funds. Whether McGill's actions constitute reasonable reliance is a matter for the trier of fact.

Even if O&W could demonstrate reliance on the March 3, 2011 conversation, it has not pleaded that portion of the claim with particularity. Under Minnesota law, negligent misrepresentation "is considered an allegation of fraud which must be pled with particularity." *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010) (citing *Juster Steel v. Carlson Co.*, 366 N.W.2d 616, 618 (Minn.Ct.App. 1985)). At a minimum, an allegation of fraud must contain the "who, what, where, why, and how" of fraudulent conduct. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549-50 (8th Cir. 1997). Here, O&W has not established "who" made the representations alleged in connection to the March 3, 2011 conversation, so that potion of the claim does not satisfy Federal Rule of Civil Procedure 9(b).[6] Fed. R. Civ. P. 9(b) ("In alleging

---

[6] There are also questions of admissibility. This Order does not address them fully, except to note that only evidence that would be admissible at trial can be considered in a summary judgment motion. *See* Fed. R. Civ. P. 56(c); *see also Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917 (8th Cir. 2004) (plaintiff "cannot rely on hearsay to avoid summary judgment"). O&W may contend that the anonymous employee's representations were not hearsay, because they were made by the agent or employee of an opposing party. *See* Fed. R. Evid. 801(d)(2)(D). Yet Rule 801(d)(2)(D) does not permit a proffering party to rest on the bare assertion that the statement

fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

Thus, the portion of the Count One that describes statements allegedly made by Associate employee Maria Brouillard on March 8, 2011 is a properly pleaded negligent misrepresentation claim, and the portion that describes the March 3, 2011 conversation with an anonymous Associated employee is not. The Court concludes that a jury could reasonably find that McGill acted in reliance on the March 8, 2011 conversation, so summary judgment is denied as to that portion of the claim.

## 2. Equitable Estoppel Claim

Estoppel is an equitable doctrine that prevents a party from "taking unconscionable advantage of his own wrong by asserting his strict legal rights." *Mut. Serv. Life Ins. Co. v. Galaxy Builders, Inc.*, 435 N.W.2d 136, 140 (Minn.App.1989) (quotation omitted), *review denied* (Minn. Apr. 19, 1989). A claim of equitable estoppel is "akin to fraud" under Minnesota law. *Del Hayes & Sons, Inc. v Mitchell*, 230 N.W.2d 588, 595 (Minn. 1975). The elements of equitable estoppel in Minnesota are:

> 1. There must be conduct-acts, language, or silence-amounting to a representation or a concealment of material facts.
>
> 2. These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him.

---

was made by an agent or employee. Instead, "[t]his rule requires the proffering party to lay a foundation to show that an otherwise excludible statement relates to a matter within the scope of the agent's employment." *Gulbranson v. Duluth Missabe & Iron Range Ry. Co.*, 921 F.2d 139, 142 (8th Cir. 1990). (citations omitted). Because O&W does not know which employee allegedly spoke to McGill on March 3, 2011, it is difficult to imagine how it will lay the proper foundation. Alternatively, O&W may argue that the March 3, 2011 is offered under Rule 801(c)(2), to show effect on the listener. This begs the question of what effect the statement had, since McGill admittedly took no action at that time.

3. The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel, at the time when such conduct was done, and at the time when it was acted upon by him.

4. The conduct must be done with the intention, or at least with the Expectation, that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon. There are several familiar species in which it is simply impossible to ascribe any Intention or even Expectation to the party estopped that his conduct will be acted upon by the one who afterwards claims the benefit of the estoppel.

5. The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it.

6. He must in fact act upon it in such a manner as to change his position for the worse; in other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct and to assert rights inconsistent with it.

*Del Hayes*, 230 N.W.2d at 594-95 (citing 3 Pomeroy, Equity Jurisprudence (5 ed.), s 805).

The portion of O&W's equitable estoppel claim relating to the March 3, 2011 conversation fails for the same reasons discussed above with respect to its negligent misrepresentation claim. First, there is a lack of particularity in the allegations relating to the March 3, 2011 conversation. "Because a claim of equitable estoppel sounds in fraud, its elements probably must be alleged with particularity under [Federal Rule of Civil Procedure] 9(b)." *Stumm v. BAC Home Loans Servicing, LP*, 11cv 3736 (PJS/LIB), 2012 WL 5250560 at *5 (D. Minn. Oct. 24, 2012). In other words, the complaint should plead the "who, what, where, when, and how" of the representations, similar to a claim of fraud or negligent misrepresentation. *Parnes* 122 F.3d at 549-50. This higher degree of notice "is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations." *Id.* (citations omitted).

Secondly, and perhaps more importantly, O&W cannot demonstrate reliance on the March 3, 2011 representations in its decision to make the wire transfer, as noted *supra*. Because the March 8, 2011 conversation was pivotal, the alleged representations on March 3, 2011 do not

satisfy the element of being "relied upon by the other party, and, thus relying, he must be led to act upon it." *Del Hayes*, 230 N.W.2d at 594-95.  Finally, the March 3, 2011 statements face the same admissibility problems described in note 6, *supra*.

Thus the portion of the Count Three that describes statements allegedly made by Associate employee Maria Brouillard on March 8, 2011 is a properly pleaded equitable estoppel claim, and the portion that describes the March 3, 2011 conversation is not.  In light of the evidence presented in the record as a whole, there are issues of material fact relating to the March 8, 2011 conversation for a jury to decide.

### D.  Breach of Warranties Claim (Count Two)

O&W alleges that Associated warranted to O&W "that it had actual knowledge that the checks had cleared and that settlement of those checks was final" and that Associated "had reasonable time to receive return of those checks from the payor bank, that the checks had not been returned, and that settlement of those checks was final."  (Compl. ¶¶ XXIII, XXIV).

A warranty is "an assurance that one party to a contract gives regarding the existence of a fact, upon which the other party can rely."  *Sterling Capital Advisors, Inc., v. Herzog*, 575 N.W.2d 121, 127 (Minn.Ct.App. 1998).  The original language of the complaint appears to relate to the March 3, 2011 and March 8, 2011 conversations.  The Court is not persuaded, on the basis of the complaint or any evidence proffered in opposition to the Motion for Summary Judgment, that these representations constitute warranties within the legal meaning of that term.

Indeed, in its Memorandum in Opposition, O&W abandons that theory of the claim, asserting instead that the warranties in question are found in the Agreement.  "[T]his Court needs to consider the language at p. 9, under "Deposits" where it says 'The bank is relieved of any

liability in connection with collection of all items that are properly handled by the bank . . .'"

(Mem. in Opp'n at 20) (citing Agreement, attached to Aff. of Matthew T. Ryon, "Ryon Aff.")

[Doc. No. 19-1 at 9]   O&W also quotes several other portions of the Agreement, each of which

contain the statement "We may" or "In some cases." For example:

> We may refuse to accept deposits, limit the amount of deposits accepted, and/or return some or all of a deposit by giving you notice either personally or by mail.

(*Id.*)

And:

> In some cases we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit.

(*Id.* at 16.).

But these statements simply do not conform to any definition of a warranty.  Associated

merely informed O&W that it "may" take certain actions—nowhere in the quoted language does

it assure O&W of a fact.  As for the portion of the Agreement that states Associated is relieved of

liability for "properly handled" items, there is no promise to handle collection of items properly,

only a statement limiting Associated's liability.

Neither the Complaint nor the claim as "restyled" in the Memorandum in Opposition

pleads an actionable breach of warranty.  Further, the facts as alleged in the Complaint, the

record and the Memorandum in Opposition do not support the existence of any warranty.

Summary judgment is particularly appropriate for this claim, since O&W only offers shifting

assertions as to what "warranties" are at issue, and no concrete facts to support them.

### E.     Breach of Contract Claims (Counts Four and Five)

Counts Four and Five are contract claims.  Court Four alleges that Associated failed to

follow the procedures in the Agreement by delaying "an unreasonable time" in ascertaining

whether the payor bank settled and paid the Retainer and Check.  (Compl. ¶ XXXIII, XXXIV).
Count Five alleges that Associated breached the agreement when Associated employee Pelissero
stated that Associated would "work it out" between the banks involved in the transaction.
(Compl. ¶ XXXVI-XXXIX).

Count Four is a viable claim for breach of contract, to the extent it alleges that Associated
did not follow the procedures in the Agreement.  While the language of the claim may not be
precise, a careful review of all the pleadings and allied materials shows that there is a dispute
about a material fact, namely the timing of Associated's handling of the Retainer and Check.
Viewing the evidence in the light most favorable to the nonmoving party, Count Four is a viable
claim.

In contrast, Count Five fails because Pelissero's statement that Associated would "work it
out" with the payor bank is not part of the Agreement.  The Agreement unequivocally states that
"[Associated] may permit some variations from our standard agreement, but any variations must
be in writing and signed by an authorized representative of the Bank."  (Agreement at 1).  Thus,
Pelissero's statement does not constitute a valid amendment to the Agreement.  Pelissero's oral
promise to "work it out" is merely a gratuitous promise, because no consideration or any other
element of contract formation accompanies the promise.  *See Baehr v. Pen-O-Tex Oil Corp.*, 104
N.W.2d 661, 664 (Minn. 1960) (explaining difference between gratuitous assurance and contract
supported by consideration) *Cederstrand v. Lutheran Bhd.*, 117 N.W.2d 213, 222 (Minn. 1962)
(noting that statement containing no "tone of bargaining or negotiating" was not an oral
contract).

### F.    Statutory Violations (Counts Seven, Eight, and Nine)

O&W alleges three statutory violations in its complaint.  Counts Seven, Eight and Nine all assert violations of "state law and federal regulation" but do not identify which statute or regulation provides a cause of action.  In its Memorandum in Opposition, O&W cites some statutes, but does not specifically identify any of them as the "state law and federal regulation" underlying Counts Seven, Eight, and Nine.  For example, O&W cites to Minn. Stat. § 336.4-103(a), Minn. Stat. § 336.4-202(a), 12 C.F.R. § 229.38, Minn. Stat. § 336.4-214(a), but only in reference to its arguments that its tort-based claims are not barred by the Uniform Commercial Code (UCC).  (Mem. in Opp'n at 6-7).

On their face, then, Counts Seven, Eight, and Nine would seem ripe for a motion to dismiss.  No such motion was filed in this case, however.  The Court has doubts that O&W's pleading gives Associated fair notice of what the statutory claim is and the grounds upon which it rests.  *See Conley v. Gibson*, 355 U.S. 41, 47-48 (1957).  At the hearing on this matter, however, O&W represented that the statutes referred to in the complaint were from Minnesota's UCC, Minn. Stat. § 336.1-101 *et seq.*  In addition, the Agreement specifically incorporates provisions of the UCC.  (*See, e.g.*, Agreement at 9, 10).  Of course, Minnesota's UCC contains hundreds of sections governing expansive fields of law ranging from secured transactions to sales of goods, and O&W did not specifically cite a provision of the UCC in its oral arguments.

The Court is reluctant to "rescue" O&W's skeletal claim, especially since O&W has had ample time to amend its complaint, and has never done so.  This Court refuses to engage in guesswork about the precise statutes or regulations O&W alleges that Associated violated, but will assume for the purposes of this motion that O&W's statutory claims arise under Article IV of Minnesota's UCC that governs Bank Deposits and Collections.  Minn. Stat. § 336.4-101 *et seq.*

The record in this case does not reveal that Associated disputes the facts underlying O&W's Counts Seven, Eight, and Nine, but only O&W's "failure to articulate the statutes allegedly violated." (Reply Mem. at 4-5).[7]  The Eighth Circuit confronted a similar situation in *Handeen v. Lemaire*, 112 F.3d 1339.  In that case, the Eighth Circuit adopted reasoning from a Fifth Circuit decision:

> Whatever the wisdom in submitting a motion that assumes the accuracy of a plaintiff's portrayal of the episode and does no more than question the sufficiency of the complaint, we see no reason to prevent a district court from granting summary judgment if the unchallenged facts cannot, as it turns out, sustain a viable cause of action.  In these situations, we agree with our counterparts on the Fifth Circuit that the submission should be evaluated similarly to a 12(b)(6) motion to dismiss.  *See Ashe v. Corley*, 992 F.2d 540, 544.

*Handeen*, 112 F.3d at 1347.

In this case, despite its sophistication and ample time to clarify its complaint, O&W has failed to state the specific portions of the UCC under which it requests relief.  Arguably, these counts could not survive a motion to dismiss had one been filed.  Nevertheless, consistent with its duty to view the pleadings in the light most favorable to the nonmoving party, the Court will permit Counts Seven and Eight to go forward, interpreting them to assert a violation of Minnesota's UCC as O&W represented at the hearing, and in accordance with the various cites to the UCC found in the Complaint.

Count Nine is factually insufficient when it alleges that Associated failed to "make written disclosure to [O&W] of its funds availability policy."  As Associated notes, the Agreement plainly contains the funds availability policy. (Mem. in Supp. at 13-14); (Agreement at 16).  Therefore, only the portion of Count Nine that alleges that Associated "failed to

---

[7]     In its Reply Memorandum, Associated suggests that viable claims may exist under 12 C.F.R. § 229.33(d) and Minn. Stat. § 335.4-215(d), but the Court is hesitant to allow the Defendant to this action to "re-write" O&W's complaint when O&W has not clearly spoken on this issue.

implement its own policies after [O&W] expressly asked [Associated] if the particular deposit represented by [the Retainer and Check] was available for withdrawal" presents a viable claim.

### G.     Negligence Claims (Counts Ten, Eleven, and Twelve)

O&W's complaint contains three negligence claims.  Count Ten asserts that Associated was negligent when it "[failed] to give seasonable notice of any non-payment or chargeback with respect to [the Retainer and Check], and/or by failing to take proper action to ascertain whether [the Retainer and Check] had been dishonored."  (Compl. at ¶ LXIV).  O&W contends that the "reasonable care" standard of the UCC gives rise to a negligence claim. Minn. Stat. § 336.3-103.

Minnesota's *Superwood* doctrine has limited the remedies available under Article II of the UCC, but has not applied those limitations to Article IV explicitly.  *See Superwood Corp. v Siempelkamp Corp.*, 311 N.W.2d 159 (Minn. 1981) (holding that economic losses arising out of commercial transactions are not recoverable under negligence and strict products liability theories).  O&W, in its Memorandum in Opposition, bases all its negligence arguments in the statutory duties of "good faith" and "ordinary care" under Article IV of the UCC, Minn. Stat. § 336.3-103(a).  "Negligence is the theory at the heart of the UCC and federal regulatory provisions at issue in this case.  The duties owed by a depository/collecting bank are all cast in terms of reasonable and ordinary care."  (Mem. in Opp'n at 11).

Thus, while O&W's negligence claims purportedly are separate from its statutory claims, the claims are based on UCC-imposed statutory duties.  Accordingly, rather than speculate as to whether *Superwood* doctrine applies to O&W's negligence-based claims, it is more correct and more efficient to consider these as poorly pleaded claims under the UCC's "good faith" and "ordinary care" standards.  The Court finds that there are legitimate questions of material fact in Counts Ten, Eleven, and Twelve, and accordingly denies summary judgment on those counts.

### H.        Breach of Fiduciary Duty Claim (Count Thirteen)

O&W asserts that Associated was its fiduciary, and "breached its fiduciary obligations to [O&W] by failing and refusing to enforce its presentment warranties and its defenses to the charge off and return of [the Retainer and Check] by the collecting and payor banks." (Compl. ¶ LXXVIII).  In support of Count Thirteen, O&W merely recites language from the Agreement that outlines Associated's policy for fiduciary accounts, and argues that "it makes sense" that Associated is O&W's fiduciary.  (Mem. in Opp'n at 19-20).  O&W provides no facts that show a fiduciary relationship ever existed.

"Generally, a bank is not in a fiduciary relationship with a customer, rather the relationship is one of debtor and creditor."  *Hurley v. TCF Banking and Sav. F.A.*, 414 N.W.2d 584, 587 (Minn.Ct.App. 1987) (citing *Stenberg v Northwestern Nat'l Bank of Rochester*, 238 N.W.2d 218 (1976)).  A bank has "no special duty to counsel the customer and inform him of every material fact relating to the transaction . . . unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank . . ."  *Norwest Bank Hastings v. Clapp*, 394 N.W.2d 176, 179 (Minn.Ct.App. 1986) (citing *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972).  This is never more true than when the depositor is a person "of experience, capable of independent judgment"—language which describes the O&W attorneys.  *Stenberg*, 238 N.W.2d at 489.  Thus, O&W's final claim fails as well, because absent special circumstances, Minnesota law is clear that a bank is not a fiduciary of its depositors.


## III.      CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants Associated Banc-Corp and Associate Bank's Motion for Summary Judgment [Doc. No. 16] is **GRANTED in part** and **DENIED in part** as follows:

   a. To the extent Defendant's Motion seeks Summary Judgment as to Count One, it is **GRANTED** as to those portions of the claim that relate to the March 3, 2011 representations, and **DENIED** in all other respects;

   b. To the extent Defendant's Motion seeks Summary Judgment as to Count Two, it is **GRANTED**;

   c. To the extent Defendant's Motion seeks Summary Judgment as to Count Three, it is **GRANTED** as to those portions of the claim that relate to the March 3, 2011 representations, and **DENIED** in all other respects;

   d. To the extent Defendant's Motion seeks Summary Judgment as to Count Four, it is **DENIED**;

   e. To the extent Defendant's Motion seeks Summary Judgment as to Count Five it is **GRANTED**;

   f. To the extent Defendant's Motion seeks Summary Judgment as to Count Six, it is **GRANTED** ;

   g. To the extent Defendant's Motion seeks Summary Judgment as to Count Seven, it is **DENIED**;

   h. To the extent Defendant's Motion seeks Summary Judgment as to Count Eight, it is **DENIED**;

  i. To the extent Defendant's Motion seeks Summary Judgment as to Count Nine, it is **GRANTED** with respect to those portions of the claim that allege Defendant failed to notify Plaintiff of the Funds Availability Policy and **DENIED** as to those portions of the claim that allege Defendant failed to follow its Funds Availability Policy;

  j. To the extent Defendant's Motion seeks Summary Judgment as to Count Ten, it is **DENIED**;

  k. To the extent Defendant's Motion seeks Summary Judgment as to Count Eleven, it is **DENIED**;

  l. To the extent Defendant's Motion seeks Summary Judgment as to Count Twelve, it is **DENIED**;

  m. To the extent Defendant's Motion seeks Summary Judgment as to Count Thirteen, it is **GRANTED.**

2. Counts Two, Five, Six, and Thirteen are **DISMISSED WITH PREJUDICE.**

Dated: March 18, 2013

              *s/Steven E. Rau*__
              STEVEN E. RAU
              United States Magistrate Judge